## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

TCS Holdings, Inc.,                                          Civil No. 07-1200 (DWF/AJB)

         Plaintiff,

v.                                                             **MEMORANDUM**
                                                                **OPINION AND ORDER**
Onvoy, Inc.,

         Defendant.

_____

Brian M. McSherry, Esq., Robert E. Kuderer, Esq., and Stacey A. Molde, Esq., Johnson & Condon, PA, counsel for Plaintiff.

Eric J. Nystrom, Esq., and John C. Ekman, Esq., Lindquist & Vennum PLLP, counsel for Defendant.

_____

## INTRODUCTION

The above-entitled matter is before the Court pursuant to cross-motions for summary judgment brought by Plaintiff TCS Holdings, Inc. ("TCS") and Defendant Onvoy, Inc. ("Onvoy"). For the reasons stated below, the Court grants in part TCS's Motion for Summary Judgment, denies Onvoy's Motion for Summary Judgment, and grants in part Onvoy's Motion for Summary Judgment on Fraud and Punitive Damages Claims.

## BACKGROUND

TCS aggregates long-distance telephone traffic to be terminated and transferred to other carriers. TCS and Onvoy entered into a one-year Telecommunications Services Agreement on September 12, 2001 (the "2001 Agreement"), under which TCS and

underlying carriers selected by TCS, including MCI WorldCom Network Services, Inc. ("MCI"), provided telecommunications services to Onvoy and its customers. The telecommunications services allowed Onvoy's customers to originate long distance calls which terminated over the international public switch network worldwide. Under Federal Law, the underlying carriers were required to pay access charges to Onvoy and its local exchange telephone company customers. Under the terms of the 2001 Agreement, TCS had no obligation to pay its underlying carrier's access charges. Specifically, the 2001 Agreement provided, in part:

> TCS and any underlying carrier used by TCS will only bill for conversation minutes of use ("Conversation MOU") . . . . Onvoy shall pay to TCS rates for Conversation MOU as set forth on the attached schedule. *TCS' underlying carriers shall pay all access charges and centralized equal access charges for traffic carried under this contract*, including all access charges for both origination and termination. . . .

(Decl. of Stacey A. Molde ("Molde Decl.") ¶ 2, Ex. 1 at § 3) (emphasis added.) The 2001 Agreement expired on or around September 11, 2002, and the parties subsequently operated under the terms of the 2001 Agreement on a month-to-month basis. TCS and Onvoy ultimately entered into a Telecommunications Services Agreement dated March 1, 2003 (the "2003 Agreement"). This case arises out of the terms of the 2003 Agreement.

On July 22, 2002, MCI filed for Chapter 11 bankruptcy. At that time, MCI owed Onvoy $791,737.63 for unpaid access charges that had accrued under the 2001 Agreement.

The Chief Executive Officer of TCS, David Hattman, negotiated the 2003 Agreement with Onvoy in Fall 2002. In particular, on September 24, 2002, Hattman met with John Cerwick of Onvoy to discuss amending the 2001 Agreement. The next day, Cerwick sent Hattman an e-mail that attached a draft of the proposed 2003 Agreement dated September 20, 2002 (the "September 2002 Draft"). After reading the September 2002 Draft, Hattman called Cerwick and approved the draft, but did not sign it because he believed that the rates contained in the draft were incorrect. (Molde Decl. ¶ 2, Ex. 9 (Dep. of David Hattman ("Hattman Dep.")) at 86-88.)

The parties offer different versions of what they ultimately agreed to. It is undisputed that in the aftermath of the MCI bankruptcy Onvoy wanted TCS to be responsible for all unpaid access charges already incurred and any unpaid access charges going forward. Onvoy claims that TCS agreed to both past and future liabilities; TCS claims that it only agreed to guarantee defaulted access charges on a "going forward" basis.

There is no dispute that the September 2002 Draft contained the following language:

> TCS's underlying carrier, or TCS in the event that the underlying carrier cannot meet its payment obligations, shall pay all access charges centralized equal access (CEA), origination, and termination charges for traffic carried under this contract. If such charges are not paid by TCS or its underlying carrier, Onvoy shall have the right to offset an equivalent amount of monies due TCS by Onvoy.

(Molde Decl. ¶ 2, Ex. 16 at § 3.) Onvoy claims that following the circulation of the September 2002 Draft, Onvoy demanded that TCS make Onvoy whole based on MCI's

3

inability to pay outstanding access charges. Specifically, Onvoy claims that its general counsel, Michael Hoff, had several conversations with Hattman about this issue. TCS maintains that Hoff had no role in negotiating the agreement with TCS and that all negotiations were with Cerwick.

On November 26, 2002, Hoff wrote a memorandum that read:

> We've reached the end [of] our proverbial rope with TCS and these settlement negotiations. The "escrow" has been dwindled from $1.2 million to zero, and now they are proposing that payout, if any, won't come for years. It's time to get paid on this debt.
>
> We owe Hattman a response to today's call. . . I will thank him again for his creativity, express interest in moving forward with this idea, an [sic] insist that we need to reach agreement on three things first: (1) anticipated WorldCom payout (assuming $0.70 right now), and (2) TCS' payment of the remaining $0.30 (or $180,000), and (3) settle-up process once WorldCom makes announcement. TCS needs to begin making good on this obligation to show good faith in moving forward together. This approach addresses each of the three above-described concerns and buys us some time to select a long-term LD services underlying carrier.
>
> Longer term, our action regarding TCS will hinge more on the business decision regarding our underlying LD carrier(s) than anything else. If we continue to use (and need) TCS for our LD MOU's, then I recommend we play ball with Hattman regarding settlement. If we no longer use (or need) TCS for our LD MOU's, then I recommend withholding the full $581,993 from our final payment.

(Molde Decl. ¶ 2, Ex. 14.)

On January 15, 2003, Hattman met with Cerwick. Cerwick had prepared copies of the 2003 Agreement. Hattman "scanned" the 2003 Agreement, initialed each page, and signed the 2003 Agreement on behalf of TCS. Hattman maintains that he signed the 2003 Agreement believing that it was identical to the September 2002 Draft. TCS

4

discovered later, however, that the 2003 Agreement that Hattman signed contained the following language:

> TCS's underlying carrier, or TCS in the event that the underlying carrier cannot meet its payment obligations, shall pay all access charges and centralized equal access charges for traffic carried under this contract *and all preceding contracts of the same nature*, including all access charges for both origination and termination. If such charges are not paid by TCS or its underlying carrier, Onvoy shall have the right to offset an equivalent amount of monies due TCS by Onvoy.

(Molde Decl. ¶ 2, Ex 2. at § 3.) The September 2002 Draft did not contain the italicized language. The record establishes that Hoff added the italicized language on January 13, 2003. Specifically, on January 10, 2002, Cerwick e-mailed Hoff a draft of the 2003 Agreement for Hoff's review. On January 13, Hoff revised the draft agreement and added the italicized language. In an e-mail to Cerwick, Hoff bolded his insertion of the italicized language, but directed Cerwick to "remove the bold" once Cerwick read it. (Molde Decl. ¶ 2, Exs. 8 & 12.) Cerwick removed the bolded insertion and presented the draft of the 2003 Agreement to Hattman. There is nothing in the record to show that this clearly material term was discussed or negotiated, let alone agreed upon, before being inserted by Onvoy.

At the time the 2003 Agreement was signed, and pursuant to the above italicized language, TCS became a surety for MCI's $791,737.63 debt to Onvoy. Without notifying TCS, on or around May 2003, Onvoy transferred its entire claim against MCI to Contrarian Capital Management, LLC ("Contrarian"), for thirty percent of its value. The relevant "Transfer of Claim" reads in part:

> SELLER [Onvoy] for good and valuable consideration does hereby irrevocably sell, convey, transfer and assign unto BUYER [Contrarian] all of SELLER's [Onvoy's] right, title and interest in, to and under:
>
> (1) the above-referenced claim of SELLER [Onvoy] (as defined in Section 101(5) of the Bankruptcy Code) against Debtor in the above-referenced Chapter 11 case (the "Case"), including, without limitation, any and all right to receive principal, interest and other amounts in respect of such claim;
>
> (2) all causes of action or other rights held by SELLER [Onvoy], whether against the Debtor or against any other party, including without limitation, any guarantor of the Debtor . . . in connection with the above referenced claim arising under or in connection with all agreements, invoices, purchase orders or other documents executed or delivered in connection with such claim;
>
> (3) all causes of action held by SELLER [Onvoy] in connection with the above-referenced claim against the Debtor or any other person or entity including without limitation, any guarantor of the Debtor . . . arising under any law, including without limitation causes of action for negligence, fraud or fraudulent transfers; and
>
> (4) all cash, securities or other property ("Distributions") distributed or received on account of, or exchanged in return for, any of the foregoing;
>
> all of the foregoing, whether against the Debtor, or any guarantor or other third party liable in respect thereof, being collectively referred to herein as the "Claim."

(Molde Decl. ¶ 2, Ex. 3 at § 1.)

On July 1, 2003, TCS sent Onvoy an invoice for $763,989.71. Onvoy offset and deducted $554,216.34 from the invoice—the remaining balance of the $763,989.71 claim that it had transferred to Contrarian. Onvoy then paid TCS $209,773.37 on the July 1, 2003 invoice.

6

On February 15, 2007, TCS brought this lawsuit, asserting claims for breach of contract, contract reformation, and unjust enrichment. On May 29, 2008, TCS filed an Amended Complaint adding causes of action for fraud and punitive damages. TCS now moves for summary judgment, alternatively, on its three original causes of action. In addition, Onvoy moves for summary judgment on TCS's claims, including those for fraud and punitive damages.

## DISCUSSION

### I.   Standard of Review

Summary judgment is proper if there are no disputed issues of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). The Court must view the evidence, and the inferences that may be reasonably drawn from the evidence, in the light most favorable to the nonmoving party. *Enter. Bank v. Magna Bank of Mo.*, 92 F.3d 743, 747 (8th Cir. 1996). However, as the Supreme Court has stated, "[s]ummary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed 'to secure the just, speedy, and inexpensive determination of every action.'" *Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986) (quoting Fed. R. Civ. P. 1).

The moving party bears the burden of showing that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law. *Enter. Bank*, 92 F.3d at 747. The nonmoving party must demonstrate the existence of specific facts in the record that create a genuine issue for trial. *Krenik v. County of Le Sueur*, 47 F.3d 953, 957 (8th Cir. 1995). A party opposing a properly supported motion for summary

judgment may not rest upon mere allegations or denials but must set forth specific facts showing that there is a genuine issue for trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986).

## II.   Breach of Contract

To succeed on its breach-of-contract claim, TCS must prove four elements: (1) a valid contract; (2) performance by plaintiff of any conditions precedent; (3) a material breach of the contract by defendant; and (4) damages. *Parkhill v. Minn. Mut. Life Ins. Co.*, 174 F. Supp. 2d 951, 961 (D. Minn. 2000) (citing *Briggs Trans. Co. v. Ranzenberger*, 217 N.W.2d 198, 200 (Minn. 1974)).

TCS contends that Onvoy breached the 2003 Agreement as a matter of law when it asserted an offset against the July 1 invoice because the offset was for the same debt that Onvoy had previously sold to Contrarian. TCS contends that at the time Onvoy took its purported offset, MCI did not owe Onvoy anything because Onvoy had transferred all rights to the MCI debt to Contrarian.

Onvoy opposes TCS's motion and moves for summary judgment on TCS's breach of contract claim. In support, Onvoy asserts that TCS's obligations under the 2003 Agreement were unaffected by Onvoy's Transfer of Claim. Instead, Onvoy asserts that it properly exercised its right to offset under Section 3 of the 2003 Agreement.[1]

---

[1]   Again, the relevant portion of Section 3 of the Agreement reads:

> TCS's underlying carrier, or TCS in the event that the underlying carrier cannot meet its payment obligations, shall pay all access charges and centralized equal access charges for traffic carried under this contract and

(Footnote Continued on Next Page)

Specifically, Onvoy asserts that the Transfer of Claim to Contrarian does not reference "debt" and that it only sold its right to payment from MCI, not TCS.  In addition, Onvoy contends that even if the Transfer of Claim is broad enough to encompass its rights under the 2003 Agreement, an anti-assignment provision in the 2003 Agreement voided any purported transfer of rights to payment and setoff against TCS.

> The anti-assignment provision in the 2003 Agreement reads as follows:
>
> Neither party may assign its rights or delegate its duties hereunder without the written consent of the other party, which consent shall not be unreasonably withheld, except that (i) if either party is sold or merged or a majority of the ownership of either party is changed, the acquiring entity shall acquire, together with the other party, the party's rights and duties under this Agreement; and (ii) either party may assign its rights and delegate its duties to any entity which controls or is controlled by, or with which it is under common control.

(Molde Decl. ¶ 2, Ex. 2 at § 8.)

The Court rejects Onvoy's assertion that it only transferred its bankruptcy claim against MCI, and not its right to payment from TCS.  The Court concludes that Onvoy transferred both the claim and the debt when it executed the Transfer of Claim.  Indeed, the broad language in the Transfer of Claim indicates that Onvoy was not left with any interest in the MCI claim and that Onvoy transferred to Contrarian any guarantee

---

(Footnote Continued From Previous Page)
    all preceding contracts of the same nature, including all access charges for
    both origination and termination.

(Molde Decl. ¶ 2, Ex. 2 at § 3.)

obligation on the MCI debt.  In particular, the Transfer of Claim provided that in addition to Onvoy's claim against MCI, Onvoy transferred all right, title and interest in

> all causes of action or other rights held by [Onvoy], whether against the Debtor or against any other party, including without limitation, any guarantor of the Debtor . . .
>
> [and]
>
> all causes of action held by [Onvoy] in connection with the above-referenced claim against the Debtor or any other person or entity including without limitation, any guarantor of the Debtor . . .

(Molde Decl. ¶ 2, Ex. 3 at § 1.)  Under the plain language of the Transfer of Claim, Onvoy no longer had a right to seek payment for MCI's debt under the 2003 Agreement when Onvoy took its "offset" from the July 1 invoice.  Thus, Onvoy breached the 2003 Agreement as a matter of law.

In addition, the Court rejects Onvoy's assertion that the anti-assignment provision voids any purported transfer of rights to payment and offset against TCS.  Although the assignment clause in the 2003 Agreement prohibits the parties from assigning their rights or delegating their duties under the contract without the written consent of the other party, Onvoy has not cited to any authority suggesting that the effect of the anti-assignment provision restores Onvoy's right to offset against TCS after it sold its claim against MCI to Contrarian.  In particular, none of the cases relied on by Onvoy stand for the proposition that a party who breaches a non-assignment clause can then assert the clause to its own benefit.

Accordingly, the Court grants TCS's motion for summary judgment on TCS's breach of contract claim.

**III.    Reformation**

A court may reform a written contract if the moving party proves by "clear and consistent, unequivocal and convincing" evidence that: "(1) there was a valid agreement between the parties expressing their real intentions, (2) the written instrument failed to express the real intentions of the parties, and (3) this failure was due to a mutual mistake of the parties, or a unilateral mistake accompanied by fraud or inequitable conduct by the other party." *Manderfeld v. Krovitz*, 539 N.W.2d 802, 805 (Minn. Ct. App. 1995) (quoting *Nichols v. Shelard Nat'l Bank*, 294 N.W.2d 730, 734 (Minn. 1980)). The district court has discretion as to whether to reform a contract. *See In re Estate of Savich*, 671 N.W.2d 746, 751 (Minn. Ct. App. 2003).

TCS moves for summary judgment on its reformation claim, asserting that the 2003 Agreement failed to express both parties' intentions because it contained the disputed eight additional words—*and all preceding contracts of the same nature*—to which TCS did not agree. TCS asserts that Hattman mistakenly believed that the agreement he signed was identical to the draft he reviewed in September 2002. TCS further asserts that Onvoy engaged in fraudulent and inequitable conduct by inserting the eight words and concealing their insertion from Hattman.

Onvoy opposes TCS's motion and moves for summary judgment on TCS's reformation claim. Onvoy asserts that contract reformation is not available as a matter of law because TCS cannot establish that Onvoy engaged in fraud or inequitable conduct. In support, Onvoy points to the fact that the parties are sophisticated business entities who engaged in an arms-length negotiation, that Hattman was given the opportunity to

11

review the 2003 Agreement before signing, and that Hattman could have asked Cerwick if any changes were made. Onvoy asserts that had Hattman read the agreement, he would have discovered the change.

After reviewing the record before it, the Court concludes that fact issues preclude summary judgment for either party on TCS's contract reformation claim. TCS has asserted a reformation claim under the theory of a unilateral mistake coupled with fraud or inequitable conduct. TCS has pointed to record evidence that demonstrates that Hattman was under the mistaken belief that he was signing a copy identical in all material respects to the September 2002 Draft that he had previously reviewed. In addition, facts in the record that relate to Onvoy's last-minute insertion of the disputed language in the 2003 Agreement, if believed by a fact-finder, could support a finding of fraud or inequitable conduct on the part of Onvoy. These factual issues are for a jury to decide. Accordingly, both parties' motions for summary judgment on TCS's reformation claim are denied.

**IV.    Fraud**

Onvoy also moves for summary judgment on TCS's fraud claim. Onvoy asserts that the fraud claim fails because TCS has identified no affirmative representation by Onvoy, the parties engaged in an arms-length transaction, and fraudulent concealment does not apply. In essence, Onvoy contends that it owed no duty to disclose to TCS that it had inserted the disputed contract language. Onvoy further asserts that TCS's fraud claim fails because it is not distinct from TCS's claim for breach of contract.

To recover under theories of both contract and tort, TCS must prove separate damages for fraud and breach. *Hanks v. Hubbard Broad., Inc.*, 493 N.W.2d 302, 308 (Minn. Ct. App. 1992). A party is not entitled to recover tort damages for a breach of contract unless the breach constitutes or is accompanied by an independent tort. *Cherne Contracting Corp. v. Wausau Ins. Cos.*, 572 N.W.2d 339, 343 (Minn. Ct. App. 1997). Here, TCS's fraud claim is based on Onvoy's conduct prior to execution of the 2003 Agreement. In particular, TCS asserts that Onvoy represented to TCS that it was entering into the 2003 Agreement to do business with TCS for another year and points to record evidence that could lead a reasonable juror to conclude that Onvoy actually entered into the 2003 Agreement to obtain a basis to assert its purported offset. In addition, TCS points to record evidence that could lead a reasonable juror to conclude that Onvoy deceptively inserted language into the 2003 Agreement that altered the terms that the parties agreed to in a material way. TCS could have pursued a fraud claim even if Onvoy never breached the 2003 Agreement. Based on the record before it, the Court determines that TCS's breach of contract and fraud claims are not based on the same facts. In addition, these two causes of action do not seek the same damages. In particular, if TCS succeeds on its fraud claim, it could recover money that Onvoy retained as an offset to its invoice plus interest, as well as out of pocket damages, including loss of business. *See, e.g.*, *B.F. Goodrich Co. v. Mesabi Tire Co., Inc.*, 430 N.W.2d 180, 183 (Minn. 1988); *Lewis v. Citizens Agency of Madelia, Inc.*, 235 N.W.2d 831, 836 ( Minn. 1975).

Fraud encompasses theories of fraudulent misrepresentation, fraudulent concealment, and fraudulent inducement. *See, e.g.*, *In re TMJ Litigation*, 113 F.3d 1484,

1497 (8th Cir. 1997).[2]  To establish fraud by misrepresentation, TCS must demonstrate that:

> (1) there was a false representation by a party of a past or existing material fact susceptible of knowledge; (2) made with knowledge of the falsity of the representation or made as of the party's own knowledge without knowing whether it was true or false; (3) with the intention to induce another to act in reliance thereon; (4) that the representation caused the other party to act in reliance thereon; and (5) that the party suffer[ed] pecuniary damage as a result of the reliance.

*Hoyt Props., Inc. v. Prod. Res. Group, L.L.C.*, 736 N.W.2d 313, 318 (Minn. 2007).  In addition, when parties make a verbal agreement and one party undertakes to reduce that agreement to writing, "the presentation of the written instrument for signature is a representation that it is the same in effect as their verbal agreement." *Phillips Petroleum Co. v. Roth*, 242 N.W. 629, 631 (Minn. 1932).

Based on the record before it, the Court concludes that fact issues remain with respect to the substantive merit of TCS's fraud claim.  The issue of whether Onvoy's conduct, with respect to the insertion of the disputed contract language into the 2003 Agreement, constitutes fraud is an issue properly left for a fact-finder.  Accordingly, the Court denies Onvoy's motion for summary judgment on TCS's fraud claim.

**V.     Unjust Enrichment**

To establish a cause of action for unjust enrichment, TCS must show that Onvoy "knowingly received something of value, not being entitled to the benefit, and under

---

[2]    Onvoy asserts that fraudulent concealment only supports the tolling of the statute of limitations.  A claim of fraud based on fraudulent concealment, however, is distinct from the theory of fraudulent concealment to toll the statute of limitations. *Iverson v. Johnson Gas Appliance Co.*, 172 F.3d 524, 529 n.3 (8th Cir. 1999).

circumstances that would make it unjust to permit its retention." *Southtown Plumbing, Inc. v. Har-Ned Lumber Co., Inc.*, 493 N.W.2d 137, 140 (Minn. Ct. App. 1992). Onvoy claims that a party cannot recover on a claim for unjust enrichment if such claim is based on a breach of an express contract.

TCS has alleged a claim for unjust enrichment as an alternative theory in the event that the 2003 Agreement is deemed invalid. TCS also alleges that Onvoy's alteration of the agreement is fraud *per se*. TCS asserts that a finding of fraud will warrant rescission of the contract and TCS's remedy will be in unjust enrichment.

The Court concludes that Onvoy's motion for summary judgment on TCS's unjust enrichment claim is premature because, at a later date, it is possible that the 2003 Agreement will be deemed invalid.

## VI. Punitive Damages

Section 6 of the 2003 Agreement reads:

> **Limitation of Liability.** Notwithstanding the provision of Section 5 of this Agreement, in no such event shall either party be liable to the other party to this Agreement for special, indirect, incidental, consequential, or exemplary damages, including loss of profits, customers, or goodwill, arising from interruption of service or otherwise relating to the relationship or conduct of business hereunder.

(Molde Decl. ¶ 2, Ex. 2 at § 6.) An identical provision appeared in the parties' 2001 Agreement. (Molde Decl. ¶ 2, Ex. 1 at § 6.)

Onvoy contends that TCS's punitive damages claim is barred as a matter of law by the plain language of Section 6. In particular, Onvoy contends that Section 6 expressly bars punitive damages based on Onvoy's alleged conduct "relating to the relationship" of

the parties.  TCS asserts that Onvoy cannot rely on a provision of the very agreement which it fraudulently altered to limit its liability for that fraud.

The Court agrees with Onvoy.  The broad language of Section 6 of the 2003 Agreement plainly limits the type of damages available to TCS.  The fact that this provision was included in the 2001 Agreement indicates that this provision was previously contemplated and agreed upon by the parties and was not inserted as a result of Onvoy's alleged fraud.

# ORDER

For the reasons stated, **IT IS HEREBY ORDERED** that:

1. Onvoy's Motion for Summary Judgment (Doc. No. 33) is **DENIED**.

2. TCS's Motion for Summary Judgment (Doc. No. 26) is **GRANTED IN PART** and **DENIED IN PART.**

3. Onvoy's Motion for Summary Judgment on Fraud and Punitive Damages Claims  (Doc. No. 78) is **GRANTED IN PART** and **DENIED IN PART**.


Dated:  September 4, 2008        s/Donovan W. Frank
                                 DONOVAN W. FRANK
                                 Judge of United States District Court